IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| WILLIAM SPECTOR, | ) | |
| | ) | |
| Plaintiff, | ) | CASE NO. 3:03CV00253 (JBA) |
| | ) | |
| v. | ) | |
| | ) | |
| EQUIFAX INFORMATION SERVICES, LLC, | ) | |
| | ) | |
| Defendant. | ) | JANUARY 15, 2004 |

**MEMORANDUM IN SUPPORT OF DEFENDANT EQUIFAX INFORMATION
SERVICES LLC'S MOTION FOR SUMMARY JUDGMENT**

### I. INTRODUCTION

Plaintiff William Spector complains in this suit about the alleged failure of Equifax

Information Services LLC to provide a copy of his credit report (1) to potential creditors in

November 2002 and April 2003 and (2) to him, upon his request, in December 2002 and May

2003. The evidence is undisputed, however, that Equifax provided him with no fewer than three

copies of his credit report between March and July 2003; that Equifax has no duty to provide his

report to the potential creditors; that Plaintiff has no actual damages as a result of these alleged

failures; and that Equifax did not willfully violate any law, thus precluding Plaintiff from

recovering either statutory or punitive damages. Equifax is, therefore, entitled to judgment as a

matter of law on all counts of Plaintiff's complaint.



NEW HAVEN, CONN.
DISTRICT C
2004 JAN 15  P 4:33
FILED

## II. **BACKGROUND**

Equifax maintains over 250 million files containing information related to the creditworthiness of consumers.[1]  These files are maintained in a database and are ordinarily available online.  Generally, in the ordinary course of business, Equifax releases a particular consumer's file in two circumstances:  (1) to an existing or potential creditor of the consumer and (2) to the consumer himself, pursuant to the federal Fair Credit Reporting Act, 15 U.S.C. §1681, *et seq.* and various similar state statutes.  In the first example, the file released is called a "credit report" or "consumer report."  In the second example, the file released is called a "consumer disclosure."

When a consumer sues Equifax, the course of business is no longer ordinary, and Equifax's policies and procedures with respect to the handling of that consumer's file change.  Because of its concern with the accuracy of the data on that file or with the possibility that identity theft is occurring, Equifax takes the consumer's file "offline" after suit is filed.  The file still exists within Equifax's database, but it is no longer accessible electronically by would-be creditors or even by Equifax personnel in charge of responding to routine consumer requests for a disclosure.  Instead, when a file is offline and Equifax receives a third-party request for that file, Equifax's Security Department generates a notice that someone has requested the file[2] and forwards that notice to the Equifax Office of Consumer Affairs in Atlanta.  That office then informs the Equifax attorney of the request for handling.

---

[1] The facts contained in this "Background" section come from the Affidavit of Alicia Fluellen and the Joint Stipulation of Facts, both filed contemporaneously herewith.

[2] A creditor requesting an offline file receives in response a notice that the file is unavailable on-line and an invitation to contact Equifax for further information.

Equifax is not required by any law – federal or state – to provide a credit report to a potential creditor. The FCRA is entirely permissive, and provides only those purposes for which a credit reporting agency *may* provide a report. It prohibits Equifax from releasing reports except in certain circumstances but does not mandate the provision of a *report* to an existing or potential creditor under any circumstance. The FCRA does require Equifax to provide a consumer's *disclosure* to that consumer; it does not, however, require that the disclosure be provided within any certain period of time (although ordinarily Equifax does so within a short period of receiving the request). In fact, when the consumer has been denied credit as a result of an Equifax report, Equifax is required, within certain limitations, to provide the disclosure free of charge. The purpose of this provision, obviously, is to enable the consumer to review his file for inaccuracies and then to call them to the attention of Equifax so that they can be corrected as needed.

This case is Mr. Spector's second lawsuit against Equifax since May 2002. Upon receipt of the first suit ("Spector I") in May 2002, in accordance with its standard procedures, Equifax took his file offline. This suit ("Spector II") was filed in February 2003, before Spector I settled in March 2003. Mr. Spector's file was placed back "online" in approximately June of 2003.

In addition to the FCRA claims noted above, Mr. Spector also claims that he is entitled to relief under the Connecticut Unfair Trade Practices Act ("CUTPA") and the Connecticut and Consumer Credit Reporting Act ("CCRA")

Mr. Spector is wrong on all counts. First, Equifax's failure to provide potential creditors with a copy of his report is not actionable because Equifax is never required to provide a creditor with a copy of a consumer's report. Second, Equifax's alleged failure to provide Mr. Spector with his disclosure does not support a finding of liability here for several reasons: Equifax provided

3

Mr. Spector--through his Counsel and directly--with no fewer than three copies of his credit report in March and July 2003. Thus, Mr. Spector's requests for a disclosure, submitted in December 2002 and May 2003, were fulfilled. Although Equifax acknowledges that they were not fulfilled as quickly as usual because mistakes occurred in their handling, they were nevertheless provided. Third, Equifax's procedures for handling disclosure requests during the pendency of litigation are reasonable, and as long as Equifax has in place reasonable procedures for the handling of these requests, Equifax is not liable for a simple mistake. Next, even if Equifax had failed utterly to provide him the requested disclosures, Mr. Spector suffered no actual damages as a result. He suffered no credit denials. He suffered no lost wages. His feeble claims of "emotional distress" are far too attenuated to meet any legal standard for recovery of those damages. He is not entitled to statutory or punitive damages because he has absolutely no evidence of willfulness on Equifax's part. Finally, his claims under CUTPA fail because he has suffered no ascertainable loss of money or property. And, his CCRA claim fails because that statute does not provide a private cause of action. In short, Mr. Spector should be out of court.

## III. STATEMENT OF FACTS

### A. Defendant Equifax Information Services LLC

Equifax is a consumer reporting agency as defined by the FCRA. (Joint Statement of Facts, para. 3). Equifax accepts information regarding a consumer's credit only from those sources of credit information, including banks, creditors and merchants, which, either on the basis of Equifax's prior experience, or because of the particular source's reputation, are determined by Equifax to be reasonably reliable sources of information. (Affidavit of Alicia Fluellen, attached hereto as Exhibit "A" and hereinafter referred to as the "Fluellen Affidavit",

4

para. 2). Equifax compiles this information into consumer reports that can be distributed to users of information who have contracted with Equifax. (*Id.*) Equifax maintains over 250 million files containing information related to the creditworthiness of consumers, including a file for Plaintiff. (*Id.*). These files are maintained in a database and ordinarily available online. (*Id*).

### B. **Plaintiff William Spector**

Plaintiff is an individual who resides in Connecticut. (Joint Statement of Facts, filed contemporaneously herewith, para. 1). He is a family practice physician who practices in Bolton, Connecticut. (Deposition of William Spector, attached hereto as Exhibit "B" and hereinafter referred to as the "Spector Depo.", p. 9, lines 19 - 25 through p. 10, lines 1 - 15). Plaintiff filed for personal bankruptcy in March of 2001. (Spector Depo., p. 16, lines 19 - 21).

### i. Plaintiff's First Lawsuit Against Equifax – "Spector I"

Plaintiff filed Spector I on May 20, 2002. He alleged that Equifax permitted Associates National Bank to review his credit file without a permissible purpose.[3] (Joint Statement of Facts, para. 28). While Spector I was pending, Plaintiff and his wife went to Ty Subaru to shop for a new car. (Spector Depo., p. 13, lines 15 - 24). They found a used car they liked, filled out a joint credit application and went home. (Spector Depo., p. 14, lines 2 -16). They later received a call in which they were informed that the dealership had submitted their credit application to a number of lenders and it was "denied by most of them." (Spector Depo., p. 15, lines 5 -14). Plaintiff claims that he and his wife each received some denial letters, but Plaintiff "[does not] remember which ones" (i.e., which creditors). (Spector Depo., p. 15, lines 15 - 25). Plaintiff has

---

[3] An account review occurs when a creditor with whom a consumer has an existing account requests all or part of the consumer's credit file. An account review is a permissible purpose under the FCRA.

produced no denial letters in discovery in this case. When asked whether any of these alleged letters stated that they were based upon an Equifax report, Plaintiff testified that "I don't recall which one, but there was one that mentioned Equifax." (Spector Depo., p. 16, lines 1 - 4).

At the time of his application, Plaintiff's Equifax credit file was "offline" as a result of the filing of <u>Spector I</u>. (Joint Statement of Facts, para. 20). In connection with Plaintiff's attempt to purchase the new car, Citizen's Bank electronically requested a copy of Plaintiff's Equifax credit report on November 27, 2002 and, since the file was offline, received the following message: "REFERRED FILE – CONTACT [EQUIFAX] CREDIT REPORTING CENTER TO GET THE FILE." (Joint Statement of Facts, para. 6; Fluellen Affidavit, para. 6). Since the file was offline, Citizen's received a message stating that the file was unavailable and advising it to contact Equifax to get the file.[4] (<i>Id</i>.). It did not receive any information from Plaintiff's credit file.[5]

In any event, no later than the end of November, three days after Citizens' tried to pull Plaintiff's Equifax credit report, Plaintiff obtained financing and bought the car. (Spector Depo., p. 18, lines 14 - 16).

---

[4] Citizen's Bank never contacted Equifax to request a copy of the credit file following its receipt of this notification, nor did Plaintiff ever contact Equifax to ask that Citizen's Bank be provided a copy of his report. (<i>Id</i>.).

[5] Apparently Citizen's Bank did, however, receive copies of both Plaintiff's and his wife's credit file from at least one other credit reporting agency (Experian/TRW). (<u>See</u> redacted copy of documents from Citizen's Bank, attached hereto as Exhibit "C". Equifax has redacted the credit related portions, but will provide an unredacted copy upon the Court's request.) Plaintiff's Experian report contained a record of Plaintiff's bankruptcy and the reason for the "turndown" was bankruptcy. (<i>Id</i>.). Plaintiff admitted in his deposition that the bankruptcy was reporting on his credit reports with other agencies at the time he applied for the auto loan. (Spector Depo., p. 17, lines 1 – 5). He naively claimed that, in relation to filing bankruptcy, "...I wasn't aware that after having been filed and discharged, there should have been anything on there that would have been that damaging." (Spector Depo., p. 23, lines 24 –25 through p. 24, lines 1 – 5). Citizens' Bank denied him credit because of his 2001 bankruptcy.

ii. <u>Plaintiff's December 12, 2002 Request</u>

After he bought the car, Plaintiff sent a letter to Equifax via regular mail dated December 12, 2002, in which he requested a copy of his credit report.[6] (Joint Statement of Facts, para. 10; Spector Depo. p. 22, lines 13 - 14). Although <u>Spector I</u> was still pending, Plaintiff made the request himself rather than going through his Counsel, Ms. Faulkner, who also represented him in that case. He wanted a copy of his credit report at that time because, as mentioned above, he did not believe that having a bankruptcy on his credit file "would have been that damaging." (Spector Depo., p. 23, lines 24 - 25 through p. 24, lines 1 - 4).

Equifax received Plaintiff's request for a credit file. (Fluellen Affidavit, para. 6). Since Plaintiff's file was offline, the request was forwarded to Equifax's Office of Consumer Affairs. (*Id.*) Under its policy, the request should then have been forwarded to Equifax's outside Counsel so that he could review the request and arrange for a copy to be sent to Plaintiff. (*Id.*) Here, the December 12, 2002, request somehow never made its way to Equifax's outside Counsel.

During the pendency of <u>Spector I</u>, on January 9, 2003, Equifax's Counsel received an e-mail from Plaintiff's Counsel advising him that she had a new "slam dunk" claim against Equifax because Plaintiff had been "denied credit based on an Equifax report" (a claim that was never supported) and because his "request for a copy of his report had been ignored." (Affidavit of J. Anthony Love, attached hereto as Exhibit "D", hereinafter referred to as the "Love Affidavit", para. 2). She did not ask him to provide her or Plaintiff with a copy of his credit file. (*Id.*) Rather, she offered to include those claims in a settlement of <u>Spector I</u> or to bring a separate

---

[6] It should be noted that both this and Plaintiff's subsequent request for a disclosure were made my mail and he never attempted to obtain a copy of his report electronically over internet or over the telephone.

7

lawsuit based upon them. (*Id.*) Equifax declined to pay the amount she was seeking to settle the

Spector II claims. (*Id.*)

On January 13, Equifax's Counsel responded to Plaintiff's Counsel's January 9

e-mail. Consistent with Equifax policies, he told her as follows:

> "When did he ask for his credit report? Give me a break. You know that all you have to do is ask me and I will send you one. Do you want me to send you one?"

Equifax's Counsel did not receive a reply to this e-mail. (Love Affidavit, para 3)

Thereafter, Equifax's Counsel learned from the Office of Consumer Affairs at Equifax

that it had no record of a disclosure request from Plaintiff, although it has since been discovered

that such a request was received by another department on or before December 20. (Love

Affidavit, para 4). Under Equifax's standard procedures with respect to the "offline" files of

Plaintiffs, the Office of Consumer Affairs should have been made aware of Plaintiff's request and

should have forwarded it to Equifax's Counsel for handling. (*Id.*).

Then, on February 3, 2003, Equifax's Counsel received another e-mail from Plaintiff's

Counsel again inquiring whether Equifax would settle "all outstanding claims"

of Plaintiff. (Love Affidavit, para. 5). Again, Plaintiff's Counsel did not ask for a copy of his

credit file, instead threatening to file her "slam-dunk suit" within a few days. (*Id.*) Equifax's

Counsel replied the same day, telling Plaintiff's Counsel that Equifax had "no record" of her

client's request (which he believed to be true) and pointing out her failure to let him know when

and how Plaintiff made his request. (*Id.*)

Equifax's Counsel received no response to his February 3, 2003 e-mail. Plaintiff's

Counsel made good on her threat, however, by filing Spector II.

8

### iii. The Settlement of Spector I

Spector I was settled on March 4, 2003. ("Love Affidavit", para. 7). One of the terms of the settlement agreement was that Equifax would provide Plaintiff with a current copy of his credit file and, if he had any further disputes, he would advise Equifax accordingly. (*Id.*). On March 10, 2003, Equifax's Counsel sent Plaintiff's Counsel a current copy of Plaintiff's credit file by overnight mail. (Love Affidavit, para. 8). On March 12, 2003, Plaintiff's Counsel sent Equifax's Counsel an e-mail with several disputes concerning the contents of the March 7, 2003 report that he had provided to her. (Love Affidavit, para. 9). Equifax made the requested changes and sent Plaintiff's Counsel an updated copy of the report on March 17, 2003. (Love Affidavit, para. 10).

Equifax's Counsel heard nothing from Plaintiff's Counsel about any inaccuracies in this updated version of his report. (*Id.*)

The Court dismissed Spector I on March 26, 2003. (Love Affidavit, para. 11). Only the Spector I claims were settled. (Love Affidavit, para. 12).

### iv. The Current Lawsuit – Spector 2

The current suit ("Spector II") was filed by Plaintiff on February 10, 2003, while the first one was still pending. (*See* Complaint). In Spector II, Plaintiff alleges that Equifax violated §§ 1681j(b) and 1681g of the FCRA, CUTPA and the CCRA by failing to send him his disclosure in response to the December, 2002 request.

### v. Gulf Oil

Sometime in March, 2003, after filing Spector II, Plaintiff went to a Gulf Oil gas station and attempted to purchase gas using an old Gulf Oil card at a "pay at the pump" location.

9

(Spector Depo., p. 32, lines 22 –25 through p. 33, lines 1 – 17). The card was declined, and he used another credit card to pay for the gas. (*Id.*). This was the first time he had ever used the Gulf Card even though he had it for "many years." (*Id.*)

When Plaintiff was unable to use the card, he contacted Gulf Oil to inquire further and was informed by its representative that the account was closed. (Spector Depo., p. 33, lines 20 - 24). On April 5, a Gulf representative apparently told him in a telephone conversation that his account had been closed several years ago at his request. (*See* letter from Gulf to Plaintiff, attached hereto as Exhibit E). On April 10, he wrote Gulf, denied that he had made such a request, and asked that the account be re-opened and his daughter be added as an authorized user on it.[7] (*See* letter from Plaintiff to Gulf, attached hereto as Exhibit F).

Gulf Oil electronically requested copies of Plaintiff's credit file on April 7, 2003 (after the Plaintiff's telephone call), and April 18, 2003. (Fluellen Affidavit, para. 8). His file was offline at the time of these requests, and Gulf received a notification similar to the one received by Citizen's Bank. (*Id.*). Gulf never contacted Equifax to request a copy of Plaintiff's file following its receipt of these notifications. (*Id.*). Nevertheless, Plaintiff's Gulf account was reactivated/reopened "about a month later." (Spector Depo., p. 32, lines 19 - 21; p. 35, lines 4 - 5). Plaintiff has used the card since with no problems. (Spector Depo., p. 35, lines 16 - 19).

---

[7] Clearly, Gulf had already closed the account before Plaintiff tried to use it at the local gas station.

10

vi. <u>Plaintiff's May 7, 2003 Request</u>

Plaintiff sent a certified letter to Equifax on May 7, 2003 requesting a copy of his credit file. (Joint Statement of Facts, para. 24). Although Equifax's Counsel does not know when, this letter eventually made its way to him and he instructed Equifax to send the disclosure directly to Mr. Spector. (Love Affidavit, para. 13). Equifax did so on or about July 16, 2003. (*Id.*) During the entire time between May 7 and July 15, while <u>Spector II</u> was pending, Equifax's Counsel did not receive a single request from Plaintiff's Counsel to send her or Plaintiff a copy of his credit file. (*Id.*) Equifax's Counsel was not aware of Plaintiff's second request for a disclosure until he received it from Equifax. (*Id.*) A copy of Plaintiff's credit file was sent directly to him on July 16, 2003. (Fluellen Affidavit, para 10).

In late August, Plaintiff's Counsel brought to Equifax's Counsel's attention some additional items on his July 16 report that he claimed were inaccurate. (Love Affidavit, para. 14). (Interestingly, several of the items disputed at this point were also on his March reports, but not disputed at that time.) (*Id.*) Equifax's Counsel forwarded these disputes directly to Equifax for handling. (*Id.*). After investigating Plaintiff's additional disputes, Equifax sent him another copy of his report in September, 2003. (Love Affidavit, para. 15)

Equifax never acted with malice or intention to harm Plaintiff in this matter. (Fluellen Affidavit, para. 11).

## IV. <u>ARGUMENT AND CITATION OF AUTHORITY</u>

### A. <u>Summary Judgment Standard</u>

Summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no

genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). Procedurally, Rule 56 places the initial burden of production of evidence on the party moving for summary judgment to demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Once that burden is met, the non-moving party must "go beyond the pleadings and by her own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial. *Id.* at 324, 106 S.Ct. 2548. The non-moving party must "do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed. 538 (1986).

The District Court then determines whether to grant summary judgment, with the understanding that "[t]here is no issue for trial unless there is sufficient evidence favoring the non-moving party for a jury to return a verdict for that party...". *Travelers Casualty and Surety Co. v. Gerling Global Reinsurance Corp. of America*, 285 F. Supp. 200, 207 (D. Conn. 2003)(citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249-50, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

## B. Equifax is Entitled to Summary Judgment on Plaintiff's FCRA Claims

Plaintiff claims that Equifax violated Sections 1681j(b) and 1681g of the FCRA. For the reasons stated below, Equifax is entitled to summary judgment on both of these claims.

### 1. Plaintiff Has No Actual Damages

The statutory "vehicles" for bringing any FCRA claim, whether for alleged violations of the two Sections at issue in this case or any other Section(s) of the FCRA, are found in Sections

12

1681n and 1681o of the FCRA. 15 U.S.C. 1681n and o. These Sections permit an individual to bring an action for negligent (1681o) and/or willful (1681n) violations of the Act. *Id.* Each of these Sections permits the recovery of "actual damages." In fact, "proof of damages is an element of recovery for a claim under the FCRA." *In re Trans Union Privacy Litigation*, 211 F.R.D. 328 (N.D. Ill. 2002) (citing *Hyde v. Hibernia Nat'l Bank*, 861 F.2d 446, 448 (5th Cir. 1988)); *see also Casella v. Equifax Credit Information Services*, 56 F.3d 469, 473 (2nd Cir. 1995) (in a case brought under Sections 1681c, 1681i and 1681g(a)(3)(A) of the FCRA, the Second Circuit held that Plaintiff bears the burden of proving actual damages sustained as a result of defendants' conduct).

At the end of Plaintiff's deposition, Plaintiff's Counsel agreed that Plaintiff was not seeking any damages other than those listed in his response to interrogatory no 8 – "postage, emotional distress and worry". (Spector Deposition, colloquy of Counsel, p. 52, lines 1 - 22) (*see* Plaintiff's Responses to Equifax First Interrogatories, Interrogatory No. 8; attached hereto as Exhibit G; Spector Depo., p. 44, lines 8 - 14). Equifax addresses each of these claims below. Further, to the extent Plaintiff may try to claim damages related to Ty Subaru/Citizen's Bank and/or Gulf Oil, Equifax addresses those claims as well.

a. Ty Subaru/Citizen's Bank

Mr. Spector has not produced any evidence whatsoever that he was denied an auto loan or required to pay a higher rate based upon an Equifax report. To the contrary, Equifax provided Citizens' Bank no information about Plaintiff when the bank attempted to access his credit file. The refusal of Equifax to provide Plaintiff's file to Citizens is not actionable, as explained below.

13

b. <u>Gulf Oil</u>

Similarly, when Plaintiff attempted to use his Gulf Oil card at the gas station in April of 2003, the account had already been closed by Gulf years earlier for reasons that had nothing whatsoever to do with Equifax. Gulf did not even request a copy of Plaintiff's report until <u>after</u> this incident occurred. Gulf did initially decline to re-open Plaintiff's account on April 8, but the account was reactivated within weeks and Plaintiff was able to use his other credit card to purchase gas. Plaintiff has used his Gulf Card since that time with no problems. He has not identified one single dollar of loss associated with this event and Equifax is entitled to summary judgment on any claims that Plaintiff is making for damages related to the Gulf Oil account.

c. <u>Postage</u>

Plaintiff has not produced any receipts or documentary evidence whatsoever of any postage that he has paid in this case. In his deposition, when asked how much postage charges he incurred, he testified that "it's really difficult for me to say, but it would be under $20." (Spector Depo., p. 44, lines 15 -18). At most, he sent one letter to Equifax by regular mail and another by certified mail. Equifax submits that the reasonable cost for his postage would be $0.74, the price of two postage stamps[8]. More importantly, having to spend a few cents on postage was not caused by Equifax's delay in sending Plaintiff copies of his credit reports. Instead, the expense of postage was incurred <u>before</u> these alleged violations (not sending the reports) ever occurred. Equifax asks the Court to enter summary judgment in its favor on any claim for postage on the grounds that such expenses were not caused by the delay in sending the credit reports and,

14

further, that the *de minimis* amount is legally insufficient as actual damages under the FCRA. These alleged damages do not justify a federal suit. Indeed, such a claim would not be suitable even for small claims court.

### d. Emotional Distress and Worry

Equifax also requests summary judgment on Plaintiff's claims for "emotional distress and worry." Plaintiff has not seen any mental health providers, psychiatrists or psychologists in relation to his claims. (Spector Depo., p. 45, lines 6 - 9). He has not been prescribed any antidepressants or anti-anxiety drugs. (*Id.* at 10 - 13). He concedes that he has had "some sleepless nights...anxiety and... annoyance" but nothing else. (Spector Depo., p. 45, lines 14 - 25). His entire testimony regarding such claims was as follows:

> Q.     What about emotional distress and/or worry, have you received any medical treatment as a result of any Equifax distress and worry from all of this?
>
> A.     I would say there's been no specific medical visits as a result of this; however, I do take medication for high blood pressure.
>
> Q.     How long have you been take high blood pressure medication?
>
> A.     Many years.
>
> Q.     Has your dosage increased since early 2003?
>
> A.     I have to be honest and say, I have missed my appointment to have it checked, so I wouldn't know.
>
> Q.     Okay. Have you seen any mental health providers or psychiatrists or psychologists as a result of any of this?

---

[8] Mr. Spector could have chosen to request his disclosure via Equifax's toll-free telephone number and would have incurred no expense at all. It was his choice on both occasions to buy the 37-cent stamp and to pay for certified mail. In any event, given his choice, he would have incurred the postage expense with or without an alleged "violation.".

A.     No, I haven't.

Q.     Have you received – been prescribed any antidepressants or anti-anxiety drugs, or anything like that, as a result of this?

A.     No, I haven't.

Q.     Have you had any physical problems as a result of any of this?

A.     Some sleepless nights.

Q.     Anything else?

A.     Just anxiety.

Q.     Anything else?

A.     I hate to use the word anger.  Maybe annoyance that continued.

Q.     Okay.  Anything else?

A.     No.

Q.     Okay.  Are there any other damages that you're seeking in this case that aren't listed in your response to interrogatory number 8?

A.     I think – let me say that number 8 details the damages we are seeking.

(Spector Depo. p. 44, lines 19 - 25 through p. 46, lines 1 - 3).

This evidence is legally insufficient to support a claim for actual damages.  In a similar case, *Cousin v. Trans Union*, 246 F.3d 359 (5th Cir. 2001), the Court considered an FCRA case in which the Plaintiff claimed that he felt "real frustrated"; "real irritated"; "like [he was] in jail"; "very upset"; "very angry" and "like nobody was listening".  *Id.* at 371.  The Fifth Circuit held that absent proof of genuine injury, there could be no compensation for mental or emotional distress in an FCRA claim.  *Id.*  The Court explained that an award for emotional distress must be supported by "evidence of genuine injury, such as the evidence of the injured party's conduct

16

and the observations of others" and that proof of such a claim required "a degree of specificity

which may include corroborating testimony or medical or psychological evidence in support of

the damage award." *Id.*; *see also Carey v. Piphus*, 435 U.S. 247, 98 S.Ct. 1042, 1052, 55

L.Ed.2d 252 (1978). "Distress is a personal injury familiar to the law, customarily proved by

showing the nature and circumstances of the wrong and its effect on the Plaintiff." *Carey*, 435

S.Ct. at 263-64. The Second Circuit adopted the reasoning of *Carey* in *Patrolmen's Benevolent*

*Assn. of the City of New York v. City of New York*, 310 F.3d 43 (2nd Cir. 2002), when it

considered a federal employment discrimination claim and, further, held that "...the mere fact

that a constitutional deprivation has occurred does not justify the award of [emotional] damages;

the plaintiff must establish that she suffered an actual injury caused by the deprivation...

Plaintiff's subjective testimony, standing alone, is generally insufficient to sustain an award of

emotional distress damages." *Id.* at 55. (internal citations omitted).

Further, the Supreme Court's holding in *Carey* was extended in *Patterson v. P.H.P.*

*Healthcare Corp.*, 90 F.3d 927, 938 (5th Cir. 1996), to cases involving federal claims for

emotional distress. Other Circuits have followed similar reasoning in federal claims involving

emotional distress awards: *Spence v. Board of Educ. of Christina Sch. Dist.*, 806 F.2d 1198,

1201 (3rd Cir. 1986) (affirming remittitur of compensatory damages because Plaintiff's testimony

was too speculative to support the verdict of $22,060; corroborating testimony was offered

regarding Plaintiff's depression, humiliation, embarrassment and loss of creativity); *Biggs v.*

*Village of Dupo*, 892 F.2d 1298, 1303-04 (7th Cir. 1990) (Plaintiff's testimony that he was

"affected emotionally," and "concerned," insufficient to support an award of $60,000; Plaintiff

17

required to show "*demonstrable* emotional distress, not just point to circumstances of the…violation which might support an inference of such injury").

Subsequent to *Patterson*, the Fourth Circuit issued its "magnum opus" on the issue of emotional distress damages recoverable in federal claims in *Price v. City of Charlotte*, 93 F.3d 1241 (4th Cir. 1996). In that case, the Fourth Circuit reviewed an emotional distress award given to the police officer Plaintiffs because of discrimination under 42 U.S.C. 1983. After reviewing at length *Carey v. Piphus* and its progeny, the court found that the officers failed to offer sufficient proof of their emotional distress and vacated the award of $3,000 per Plaintiff. *Price*, 93 F.3d 1241, 1257. The evidence proffered by the Plaintiffs was that they felt "humiliated," "betrayed," and "deceived." *Price*, 93 F.3d 1241, 1248. The court identified the factors to be considered in determining whether a Plaintiff has offered sufficient evidence of an emotional distress injury. Those factors are: (1) whether the Plaintiff lost the esteem of (his) peers; (2) whether the Plaintiff suffered physical injury as a consequence of (his) emotional distress; (3) whether the Plaintiff received psychological Counseling or other medical treatment; (4) whether the Plaintiff suffered a loss of income; (5) the degree of emotional distress; (6) the context of the events surrounding the emotional distress; (7) the evidence tending to corroborate the Plaintiff's testimony; (8) the nexus between the challenged conduct and the emotional distress; and (9) any mitigating circumstances. *Price*, 93 F.3d at 1254, *citing Spence*, 806 F.2d at 1201; *Fitzgerald v. Mountain States Telephone and Telegraph Co.*, 68 F.3d 1257, 1265-66 (10th Cir. 1995).

The nature and circumstances of this case explain why Mr. Spector's evidence of distress is so flimsy – he suffered none. This is not a case where a Plaintiff was denied a mortgage, or a job, or had to pay a higher interest rate because of errors on his credit report. This is not a case

18

where a consumer suffered public embarrassment or humiliation because of a denial of credit. Nor is it a case where a consumer contacted a credit reporting agency multiple times in a futile effort to have inaccuracies corrected. Finally, this is not even a case where a consumer was denied credit based on inaccuracies in his report that he needed to correct quickly to get the desired credit—to the contrary, the creditors he testified about (Citizens' Bank and Gulf Oil) did not even see his report.

At its heart, this is simply a case where Mr. Spector did not get a copy of his own credit file as quickly as he thought he should (and, indeed, as quickly as Equifax thinks he should). The evidence is indisputable, however, that Mr. Spector at all times had in place a powerful but unused tool at his disposal had he truly suffered at all from this delay: his attorney. During the first complained-of delay between late December 2002 and March 2003, Mr. Spector's Counsel was in virtually constant contact[9] with Equifax's attorney and never once asked for his disclosure, despite Equifax's Counsel's invitation to do so. The same is true of the second period of delay between May 2003 and July 2003. If Mr. Spector were truly suffering "sleepless nights," and did not want to follow up himself on his requests to Equifax, he certainly had within his control a means to end those nights.[10]

---

[9] This lawsuit is not Plaintiff's Counsel's only FCRA case against Equifax. At any given time, she typically has several, each of which usually involves multiple telephone calls, e-mails, letters, and personal meetings at hearings, depositions, conferences, mediations, and the like.

[10] Equifax does not suggest or mean to imply here that a consumer needs to hire an attorney to get a copy of his or her disclosure. Rather, under the particular facts of this case, Equifax suggests that the existing lawsuit and presence of his attorney coupled with zero follow-up on his disclosure requests are powerful evidence that the delay in providing the disclosures caused Plaintiff no distress at all.

Since Plaintiff has no actual damages, he cannot prove an essential element of his FCRA claims. However, in the interest of completeness, Equifax provides the following additional grounds for summary judgment.

ii.  <u>1681j(b)</u>

Plaintiff's first claim is that Equifax violated Section 1681j(b) of the FCRA. This Section provides, in relevant part, as follows:

> "Free Disclosure After Adverse Notice to Consumer: Each consumer reporting agency that maintains a file on a consumer shall make all disclosures pursuant to Section 609 without charge to the consumer if, not later than 60 days after receipt by such consumer of a notification pursuant to Section 615...the consumer makes a request under Section 609."

In the present case, Plaintiff did not receive an adverse action notice from either Ty Subaru or Citizen's Bank. Citizen's processed and declined Plaintiff's application because of his 2001 bankruptcy, as accurately appeared on the credit report that it was able to obtain from Experian (formerly TRW). Since Plaintiff did not receive any adverse action notice, the disclosure requirements of Section 1681j(b) do not apply and Equifax is entitled to summary judgment on any such claims.

Plaintiff did receive an adverse action from Gulf Oil in early April 2003 and thus was entitled to a free disclosure. At the time of this letter, however, Plaintiff already had his updated disclosure of March 17 and knew what was on his Equifax report even though Gulf Oil did not see it. Equifax received Mr. Spector's disclosure request on May 10, 2003, and sent it to him free of charge on July 16, 2003. Section 609 of the FCRA does not contain any deadline for providing the disclosure referenced in Section 1681j(b) and Equifax submits that it is entitled to summary judgment on Plaintiff's claims under 1681j(b) related to the Gulf Oil account for this

20

reason. To hold otherwise would be writing a provision into the FCRA that does not exist.

Moreover, Plaintiff has shown no damages as a result of this delay in getting a copy of his credit

file following the May 10, 2003 request .

### iii. 1681g

Section 1681g of the FCRA provides, in relevant part, that "[e]very consumer reporting

agency shall, upon request, and subject to Section 610(a)(1), clearly and accurately disclose to

the consumer [a copy of his credit file]." 15 U.S.C. 1681g. Like Section 1681j(b), this Section

contains no deadline for providing a credit file after it has been requested. Here, Plaintiff

requested the first report on December 12, 2002 and admittedly was not sent a copy until March

10, 2003, approximately three months later. The second request was May 7, 2003 and Plaintiff

was sent a copy on July 16, 2003, a little over two months later. These delays, in the absence of

an express statutory deadline, do not violate the FCRA. As with Section 1681j(b), to hold

otherwise would effectively result in writing a provision into the FCRA that does not exist.

Further, neither Section 1681j(b) nor Section 1681g of the FCRA imposes strict liability

on Equifax even for a total failure to provide a consumer a disclosure upon request, much less for

an unacceptable delay in doing so. In Congressional recognition, perhaps, of the millions of

requests processed by credit reporting agencies every day and the inevitability of mistakes, the

FCRA is not a strict liability statute. For example, Section 1681e(b), one of the two most

important Sections of the statute, requires only that an agency maintain "reasonable procedures"

to assure maximum possible accuracy of a report. Courts have emphasized multiple times that a

simple mistake does not subject the agency to liability under this Section. Similarly, Section

1681(i), the Section requiring agencies to investigate consumers' disputes, has long been

21

interpreted to require only a "reasonable," not a perfect, investigation. Recent amendments to the

FCRA now codify this interpretation. *See* "Fair and Accurate Credit Transactions Act," 117 Stat.

1952, Section 317 (effective December 4, 2003).

Plaintiff, here, can point to no authority, nor suggest any legal basis, for a strict liability

standard under the disclosure Sections of the FCRA. Thus, the question should be whether

Equifax maintains reasonable procedures to provide disclosures to consumers even when

engaged in litigation with those consumers. The answer to that question must be "yes."

Therefore, the undisputed fact that human errors intervened in this case such that those

procedures were not followed as quickly as they should have been does not justify the imposition

of liability on Equifax.

Here, the undisputed testimony of Equifax's representative Alicia Fluellen and Equifax's

attorney Tony Love sets forth and confirms the reasonableness of Equifax's procedures with

respect to the provision of disclosures to consumers who are also Plaintiffs. In essence, those

procedures simply require that the Equifax attorney handling the case be made aware of the

request so that he or she can comply with it in the context of the litigation. This is a reasonable

procedure. Like any other litigant, Equifax must be permitted at least to assess the flow of

information between itself and the Plaintiff, whether that information is sought through formal

discovery or through direct contact between Plaintiff and the company. A consumer in litigation

with Equifax, like any other consumer, unquestionably is entitled to contact the agency to obtain

a disclosure or to dispute information on his or her credit report. Equifax's attorney, however,

needs to know of the contact and to be able to participate in the process—not to abrogate the

consumer's rights but to handle the requests consistently with his or her defense of the case.

Therefore, rather than automatically sending a disclosure to a consumer, as is ordinarily done,

Equifax notifies its attorney of the request and the attorney arranges for the disclosure to be sent

(or the dispute to be processed) in a timely fashion. Here, for unknown reasons, the process did

not operate as it is supposed to and as it has operated in hundreds of cases over the years. That

does not mean, however, that the procedure itself is unreasonable.

    iv. <u>Equifax's Offline Procedure Does not Violate the FCRA</u>

    Plaintiff apparently alleges that Equifax's policy of taking files offline as a result of

litigation violates Sections 1681j(b) and 1681g. The Court does not even need to address this

issue since Equifax is entitled to summary judgment on those claims for the reasons stated above.

Further, the reason Plaintiff was not sent copies of his credit reports sooner had nothing to do

with his file being offline. As mentioned above, Equifax's policy for handling a disclosure

request for offline files is to forward the request to outside Counsel who then arranges to send the

disclosure to the attorney or the consumer/Plaintiff. There were admittedly delays in that process

in this case, but the offline status of the file was not the cause of that delay. Accordingly,

Equifax is entitled to summary judgment on any claim that taking files offline in and of itself

violates Sections 1681j(b) or 1681g.

    Further, Plaintiff's Amended Complaint also contains the following statement: "[w]hen

defendant takes a report offline, a potential creditor is not provided with an accurate or complete

copy of the consumer's report upon request." Amended Complaint, para. 14)[11]. This aspect of

Plaintiff's complaint fails to state a claim, either under Sections 1681j(b) or 1681g, which deal

---

[11] It is not, as Plaintiff seems to suggest, that Equifax sends the creditor an inaccurate or incomplete report. Indeed, Equifax sends no report to the creditor under these circumstances.

only with disclosures to consumers, not with reports to creditors, or under any other Section of the FCRA or state statute.

With respect to the furnishing of reports to creditors, the FCRA is permissive, not mandatory. Section 1681b states that "any consumer reporting agency *may* furnish a consumer report under the following circumstances and no other." 15 U.S.C. 1681b (emphasis added). The Section then lists the circumstances under which a credit report *may* be furnished to a third party. Nowhere in this Section is the word "shall" used when it comes to furnishing reports. To the contrary, many other Sections of the FCRA use the word "shall" when setting forth various requirements under the FCRA. *See, e.g.*, 15 U.S.C. Sections 1681e, h, i. If Congress intended for Section 1681b to be mandatory, then it would have used the word "shall," as it did in other parts of the Act, rather than "may." Even the Federal Trade Commission ("FTC") has recognized that the statute is permissive in this context. The Official Staff Commentary to Section 604 of the FCRA states that "[t]he consumer reporting agency may refuse to furnish the report because the statute is permissive, not mandatory." *FTC Official Staff Commentary to Section 604(2) of the FCRA*, para. 2. To hold otherwise would be to graft into the statute the notion that a consumer is somehow entitled to require Equifax to provide a report each and every time one is sought. For a variety of reasons, this is not the law.

    v.  Equifax is Entitled to Summary Judgment on Plaintiff's Statutory and Punitive
        Damages Claims Under the FCRA

Section 1681n of the FCRA provides for statutory and punitive damages if a consumer reporting agency "willfully fails to comply with any requirement imposed [under the FCRA]." 15 U.S.C. 1681n. Here, Equifax is entitled to summary judgment on Plaintiff's claims for

24

statutory and punitive damages for the reasons set forth above as well as those additional reasons below.

The standard for statutory and punitive damages is very high in FCRA cases. In order to be found in willful noncompliance, a defendant "must have 'knowingly and intentionally' committed an act in conscious disregard for the rights of others." *Stevenson v. TRW Inc.*, 987 F.2d 288, 293-4 (5th Cir. 1993) (quoting *Pinner v. Schmidt*, 805 F.2d 1258, 1263 (5th Cir. 1986), *cert. denied*, 483 U.S. 1022 (1987)). Further, "[o]nly defendants who engage in 'willful misrepresentations or concealments' have committed a willful violation and are subject to punitive damages under §1681n." *Stevenson*, 987 F.2d at 294. In *Cousin v. Trans Union, supra*, the Fifth Circuit held that reinserting an account that had been previously deleted pursuant to a consumer's dispute did not rise to the level of a willful violation. *Cousin*, 246 F.3d at 579. In *Casella v. Equifax Credit Info. Servs.*, 56 F.3d 469 (2d Cir. 1995), *cert. denied*, 517 U.S. 1150 (1996), the Second Circuit held that a consumer reporting agency's failure to delete inaccurate information despite notification to do so did not rise to the level of a willful violation. *Casella*, 56 F.3d at 472. In *Stevenson, supra*, the Fifth Circuit reversed an award of punitive damages where the consumer reporting agency (1) took over two months to investigate Plaintiff's dispute; (2) continued to report an account it had been unable to verify; (3) continued to report an account that reinvestigation had shown to be inaccurate and (4) allowed previously deleted information to reappear on Plaintiff's credit file. *Stevenson*, 987 F.2d at 293-94.

In the present case, Equifax was late (in terms of its own policies, not any legal requirement) in sending Plaintiff two copies of his credit report when he requested them. Equifax's policies concerning the matter were reasonable - upon request by a consumer for a file

25

that was offline, the request was sent to Equifax's outside Counsel to arrange delivery of the file.

There was no sinister scheme or plan to keep Plaintiff from getting a copy of his reports. Indeed,

in mid-January, Equifax's attorney acknowledged his right to a copy of his credit report and

offered to send his attorney one. Equifax did not act with malice and had no intention to harm

Plaintiff. To the contrary, Equifax was in litigation with Plaintiff and had no reason to make

things worse by intentionally trying to harm him in any way whatsoever. Whenever it received

his disputes, it reinvestigated them. As evidenced by the cases cited above, the courts have

consistently held that mistakes by a consumer reporting agency – even repeated ones – do not

mean that the high evidentiary standard necessary to establish a willful violation has been met.

In this case, Equifax did not act with the intent to harm Plaintiff or in any callous or reckless

disregard of his rights, and it is entitled to summary judgment on his claims for punitive

damages.

### C. **Equifax is Entitled to Summary Judgment on Plaintiff's CUTPA Claims**

The Connecticut Unfair Trade Practices Act ("CUTPA") provides that "no person shall

engage in unfair methods of competition and unfair or deceptive acts or practices in the conduct

of any trade or commerce." Conn. Gen. Stat. § 42-110b(a)(1995). Here, Equifax did not engage

in any "unfair or deceptive act or practice". It delayed in sending Plaintiff a copy of his credit

report. This is not the type of conduct intended to be addressed by CUTPA.

Further, in order to recover under CUTPA, Plaintiff must show that he sustained an

"ascertainable loss of money or property" as a result of the allegedly unfair or deceptive conduct.

*Parker v. Shaker Real Estate*, 47 Conn. App. 489, 496, 705 A.2d 210, 214 (1998). As explained

above, Plaintiff cannot show one dollar of out of pocket loss related to Equifax's delay in sending

26

his credit reports to him nor does he have any legally sustainable claim for emotional damage or "worry". In the absence of any damages, Plaintiff's CUTPA claim must fail as a matter of law.

### D. Equifax is Entitled to Summary Judgment on Plaintiff's CCRA Claim

Plaintiff's Complaint vaguely references the CCRA. However, the CCRA does not provide a private cause of action. Instead, it provides only for regulatory penalties. *See* Conn. Gen. Stat. 36a-696. Accordingly, Equifax is entitled to summary judgment on Plaintiff's CCRA claims.

## V. CONCLUSION

For the reasons stated above, Defendant Equifax requests that its Motion for Summary Judgment be granted.

Respectfully submitted,

EQUIFAX INFORMATION
SERVICES, LLC

By_____

Eric D. Daniels (ct 01582)
Jason M. Kuselias (ct 20293)
ROBINSON & COLE LLP
280 Trumbull Street
One Commercial Plaza
Hartford, CT 06103-3697
E-mail:  edaniels@rc.com
E-mail:  jkuselias@rc.com
Tel. No. (860) 275-8200
Fax No. (860) 275-8299

27

and, of counsel

J. Anthony Love, Esq.
Georgia Bar No. 459155
KILPATRICK STOCKTON LLP
1100 Peachtree Street, Suite 2800
Atlanta, Georgia  30309
E-mail:  ToLove@kilstock.com
Tel. No. (404) 815-6500

## CERTIFICATE OF SERVICE

This is to certify that a copy of the foregoing has been sent via Federal Express, on the 15th day of January, 2004 to:

>Attorney Joanne S. Faulkner
>123 Avon Street
>New Haven, CT  06511-2422

Jason M. Kuselias