



UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

WILLIAM SPECTOR                        :

v.                                     :        NO. 3:03cv253 (JBA)

EQUIFAX INFORMATION SERVICES    :

## Ruling on Plaintiff's Motion for Partial Summary Judgment [Doc. #58], Plaintiff's Motion for Leave to File Supplemental Objection to Magistrate Judge's Orders [Doc. #64], Defendant's Motion for Summary Judgment [Doc. #65], Defendant's Amended and Supplemental Motion for Summary Judgement [Doc. #72], Plaintiff's Motion to Strike Love Affidavits [Doc. #76], Plaintiff's Motion for Permission to Supplement His Reply in Support of Summary Judgment [Doc. #89] and Recommended Ruling [Doc. #92]

Plaintiff William Spector's amended complaint [Doc. #23] claims defendant Equifax Information Services, LLC ("Equifax") failed to provide him a copy of his credit file after his requests of December 12, 2002 and May 7, 2003 as a result of his file having been taken "off-line" by Equifax after he sued it on June 7, 2002, in violation of the Fair Credit Reporting Act, 15 U.S.C. § 1681 et. seq. ("FCRA"), Connecticut Unfair Trade Practices Act, Conn. Gen. Stat. § 42-110a et. seq. ("CUTPA"), the Consumer Credit Reports Act, Conn. Gen. Stat. § 36a-695 ("CCRA"), and common law.  On June 7, 2004, Magistrate Judge Joan Glazer Margolis issued a recommended ruling granting summary judgment in favor of Equifax on all of Spector's claims and disposing of all but one of the related pending motions captioned above.  By objection filed June 23, 2004, Spector requested de novo review

1

of three portions of the Magistrate Judge's recommended
disposition.  As set forth below, pursuant to Fed. R. Civ. P.
72(b), the objected to portions of the Magistrate's recommended
decision are ADOPTED and APPROVED in PART and MODIFIED in PART
and the unobjected to portions are ADOPTED and APPROVED.


**I.   Plaintiff's and Undisputed Facts**

Spector is an individual who resides in Connecticut and is a
consumer within the meaning of the FCRA.  Equifax has its
principal offices in Atlanta, Georgia and is a consumer reporting
agency within the meaning of the FCRA.  Equifax compiles credit
information into consumer reports that can be distributed to
users of the information who contact Equifax.  It maintains over
250 million files containing information related to consumers'
creditworthiness, including a file for Spector.  The files are
maintained in a computer database and ordinarily available
online.  As a general matter and as relevant to this case, in the
ordinary course of business, Equifax releases a consumer's file
in two circumstances: (1) to an existing or potential creditor of
the consumer and (2) to the consumer pursuant to the FCRA and
various similar state statutes.  When released to a creditor, the
file is termed a "credit report" or "consumer report"; when
released to a consumer, the file is termed a "consumer
disclosure."  Equifax's business is quite lucrative, yielding in

2

excess of $200 million in revenue during the calendar year 2002.

At the heart of this case are the policies Equifax employs when sued by a consumer. First, Equifax takes the suing consumer's credit file "offline." This means that the file, although still in Equifax's computer database, is unavailable electronically to potential creditors and Equifax personnel who are responsible for responding to routine consumer requests for disclosure of credit reports. The potential creditor requesting the suing consumer's file receives a message stating that the file is unavailable and information on how to contact Equifax for further information, if desired. Equifax claims that it follows this offline procedure to protect itself, its customers and consumers from harm and/or further damage or lawsuits resulting from providing credit reports that contain disputed or possibly inaccurate information and, in some instances, due to concerns about possible identity theft. Equifax does not put a consumer's credit report back on line after being sued until advised by outside counsel that the case has been settled and dismissed or that all issues related to the accuracy of the report have been resolved.

Second, in order to comply with the FCRA's requirement of providing a credit file to a requesting consumer upon the consumer's request, see 15 U.S.C. § 1681g(a), when that consumer has sued Equifax and, pursuant to policy, had his or her report

3

removed from online access, Equifax employs a backup policy.  The
Equifax operator responsible for responding to the suing
consumer's request receives a "file not available" message
whenever attempting to respond.  The operator, who often works in
Jamaica, is then supposed to forward the request back to
Equifax's Office of Consumer Affairs in Atlanta, Georgia.  That
office is then supposed to forward the request to the outside
counsel representing Equifax in that requesting consumer's
litigation and the outside counsel is responsible for handling
the request.  This case demonstrates that there are perils
inherent in such a cumbersome and multi-step process.

   Spector's story and journey through Equifax's policy
labyrinth began on May 20, 2002 when Spector sued Equifax,
alleging Equifax had permitted users to access his credit file
impermissibly for account reviews even though plaintiff had no
account with those users.  <u>See</u> <u>Spector v. Equifax</u>, No. 3:02cv870
(GLG)(<u>Spector I</u>).  Spector was represented in that case by his
current counsel, Joanne Faulkner, and Equifax by its, J. Anthony
Love.  Upon receipt of the lawsuit, on or about June 7, 2002,
pursuant to its standard procedure, Equifax took Spector's credit
file off line.

   In November 2002, Spector and his wife applied for credit
with Citizens Bank to acquire a car.  Citizens Bank made an on-
line request to Equifax for Spector's credit report.  Because

4

Spector's file was offline as a result of <u>Spector I</u>, Equifax responded to Citizens Bank's request on November 27, 2002 as follows:

> ""REFERRED FILE - CONTACT CBI CREDIT REPORTING CENTER TO GET THE FILE""

Citizens Bank did not contact Equifax to obtain a copy of Spector's credit file after receiving this response.  Citizens' Bank instead obtained Spector's credit report from Experian and, because the report showed Spector had filed for personal bankruptcy in March 2001, denied Spector credit.  Three days after Citizens' Bank attempted to pull Equifax's credit report on Spector, Spector obtained financing and purchased the car.

On December 12, Spector wrote to Equifax, requesting a copy of his credit disclosure: "I currently have an ongoing legal dispute with your company, and have recently been turned down for a car loan as a result of information obtained from my credit report.  Please forward a copy of my current credit report as soon as possible."  Equifax received Spector's request by December 20, 2002, and the request made its way to Equifax's Operator Z45, Jacqueline Graham, who was not able to process it because Spector's file was off line.  In accordance with policy, Ms. Graham redirected the request to Equifax's Office of Consumer Affairs.  That is where it stopped.  The request did not make it to Equifax's outside counsel, Attorney Love, for review and handling.  Although throughout most of this litigation, Equifax

5

denied receipt of Spector's December 12, 2002 letter, after the close of discovery, it found the letter and accompanying envelope in its own file.  It then provided it to Spector's counsel by supplemental disclosure dated December 31, 2003.

Contemporaneous with his own letter, Spector drafted a letter to Equifax for his wife, which she read and signed: "I have recently been turned down for a car loan as a result of information obtained from my credit report.  Please forward a copy of my current credit report as soon as possible."  Spector also mailed his wife's letter on December 12, 2002.  Equifax received it before December 20, 2002, and, on that date, mailed a copy of Mrs. Spector's consumer disclosure to her.  Both Spector and his wife's letters were mailed at the same time from the same location with proper postage and proper return addresses and addressed to Equifax at P.O. Box 740241, Atlanta, GA 30374.  Mrs. Spector's file was not off line.  As demonstrated by the reply to Mrs. Spector's letter, Equifax typically responds to consumer disclosure requests whose credit files are online on the same day or within a few days of receipt of such request.

On January 9, 2003, Faulkner wrote Love, stating, "We now have a slam dunk ... claim against Equifax. [Spector] was denied credit based on an Equifax report.  His request for a copy of his report has been ignored."  On January 13, 2003, Love responded, "... When did he ask for his credit report?  Give me a break.

You know that all you have to do is ask me and I will send you one.  Do you want me to send you one?".  The same day, Faulkner wrote back: "... I know that you would send me a report. However, you are not entitled to get it or see it.  Neither am I. So I am not asking OR authorizing you to do so."  Shortly thereafter, Love learned from Equifax's Office of Consumer Affairs that it had no record of a disclosure request from Spector, although that obviously turned out to be erroneous.

On February 3, 2003, Faulkner e-mailed Love again, indicating that she would file Spector's non-disclosure lawsuit within four days.  Love responded the same day, informing Faulkner that Equifax had no record of Spector's December 12 request (again incorrect), and pointing out her failure to inform him when and how Spector had made the request.  Faulkner did not respond to Love's reply e-mail.

Spector filed the present suit on February 10, 2003, alleging Equifax's failure to provide Spector with a credit report after receipt of his December 12, 2002 request in violation of, among other statutes, 15 U.S.C. § 1681g(a).  On February 13, 2003, Faulkner sent Love an e-mail with a copy of the complaint attached, stating, "Heads up, here is the next suit. ...  Please see that a copy of his credit report is sent to him, not to you or me.  I will let you know of any errors."

On March 10, 2003, pursuant to a provision of the settlement

7

agreement for <u>Spector I</u>, Love sent Faulkner a copy of Spector's credit file by overnight mail.  After revisions based on Faulkner's responses, Love provided Faulkner an updated copy of Spector's credit file on March 17, 2003.  Faulkner conveyed nothing more to Love regarding inaccuracies in the updated file and <u>Spector I</u> was dismissed on March 26, 2003.

Sometime in late March 2003, Spector attempted to purchase gas at a "pay at the pump" Gulf Oil gas station using an old Gulf Oil card.  The card was declined, forcing Spector to use another credit card to pay for the gas.  Spector had possessed the Gulf card for many years but had never tried to use it.  On April 5, Spector contacted Gulf Oil and learned from a representative that the company believed his account to have been closed several years ago at his own request.  On April 7, 2003 (and again on April 18, 2003), Gulf Oil electronically requested a copy of Spector's credit file.  Both times, it received a file off-line response from Equifax similar to the one received by Citizens Bank in November 2002.  Like Citizens Bank, Gulf Oil did not follow up with Equifax on either occasion.  On April 8, 2003, Gulf Oil sent an adverse action letter to Spector: "During a recent review of your Gulf Oil Limited Partnership account, a credit report was obtained from: Equifax Information Service....  Because of the information in this report, your account remains closed."  Sometime in late April/early May 2003, Gulf Oil

8

reactivated Spector's card and he has since used it without incident.

On May 7, 2003, Spector wrote Equifax, requesting a copy of his consumer disclosure: "I have recently been turned down for a Credit Card as a result of information obtained from the credit report issued by your company.  Please forward a copy of my current credit report as soon as possible."  Spector sent the letter by certified mail, return receipt requested; the letter was delivered to Equifax's Atlanta, Georgia post office box on May 9, 2003, and signed for on May 10, 2003.  Equifax's backup disclosure policy worked this time, almost.  The request apparently made it to Jamaica and back to Atlanta and into Love's litigation file.  On June 3, 2003,[1] Love then e-mailed Equifax personnel (being in charge of handling requests, Love is presumed to have asked the right person) instructing that a credit report be sent to Spector in response to Spector's May 7 letter.

On July 10, 2003, the parties met in Hartford, Connecticut for a settlement conference.  Those present included Equifax's representative Al Cole and Equifax's local counsel but not Love. Spector showed Cole and local counsel a copy of his May 7 request for disclosure and return receipt showing delivery on May 9 and Equifax's receipt on May 10 and informed them no response was yet

_____

[1] There is confusion in the record whether this e-mail was sent on June 3 or June 15.  June 3 is more favorable to plaintiff and so is used for summary judgment purposes.

9

forthcoming.  On July 16, 2003, Equifax sent a copy of Spector's credit file to him.[2]  On October 1, 2003, Love signed interrogatory responses on behalf of Equifax stating that Equifax had no record of receiving Spector's May 7 letter.

On December 9, 2003, in preparation for a settlement conference before Magistrate Judge Margolis to be held the following day, Love discovered Spector's original May 7, 2003 letter in his litigation file.  Love explains by affidavit that he did not recall ever receiving the letter or seeing it previously in his file.  Before the settlement conference began, Love provided Faulkner with a copy of the letter, showed her the original, and explained that he believed he had neither received the letter nor seen it in his file prior to that time.  After the settlement conference and pursuant to Magistrate Judge Margolis' order, see Mem. [Doc. #48] ¶ 2, Love reviewed Equifax's internal file and found a copy of his June 3 e-mail to Equifax directing a response to Spector's May 7 request.  Love explains by affidavit that he had no memory prior to that epiphany of sending the e-mail, that he never intended to improperly withhold the letter, and that he forgot about ever receiving it prior to the time he prepared for the settlement conference.  On December 31, 2003,

---

[2] In late August, Faulkner brought to Love's attention items on the July 16 report that Spector claimed were inaccurate.  Several of the disputed items were also on the March credit files Spector had received from Equifax.  Love forwarded the disputes to Equifax for handling and, after investigation, Equifax sent Spector another copy of his credit file on September 25, 2003.

Love signed supplemental responses for Equifax stating that Spector's May 7 letter was apparently received at Equifax's post office box in Atlanta, forwarded to one of Equifax's outside vendors in Jamaica, returned to Equifax's legal department in Atlanta, and then sent to Love.

Spector's credit file remained off-line until June 19, 2003. It is unexplained in the record why Spector's credit file was put back on-line in June 2003 given that the current lawsuit has continued from that date until the present.  In addition, although Equifax asserts in briefing that its off-line and backup disclosure policies have worked well hundreds of times for many years, see Mem. in Supp. [Doc. #66] at 23, there is no record evidence to support this assertion.

As actual damages for Equifax's failure to respond to his December 12, 2002 and May 7, 2003 credit file requests, Spector claims postage costs and emotional distress.  The following deposition testimony is the only record evidence of those damages:

Q.   Let's look at your response to interrogatory number 8. You've listed there some damages that you're seeking in this lawsuit.  And the first sentence says, "Postage, emotional distress, and worry"?

A.   Yes.

Q.   How much have you spent on postage in this case?

A.   That's a really good question.  I think it's really difficult for me to say, but it would be under $20.

11

Q.   What about emotional distress and/or worry, have you
     received any medical treatment as a result of any emotional
     distress and worry from all of this?

A.   I would say there's been no specific medical visits as a
     result of this; however, I do take medication for high blood
     pressure.

Q.   How long have you been take high blood pressure medication?

A.   Many years.

Q.   Has your dosage increased since early 2003?

A.   I have to be honest and say, I have missed my appointment to
     have it checked, so I wouldn't know.

Q.   Okay. Have you seen any mental health providers or
     psychiatrists or psychologists as a result of any of this?

A.   No, I haven't.

Q.   Have you received - - been prescribed any antidepressants or
     antianxiety drugs, of anything like that, as a result of
     this?

A.   No, I haven't.

Q.   Have you had any physical problems as a result of any of
     this?

A.   Some sleepless nights.

Q.   Anything else?

A.   Just anxiety.

Q.   Anything else?

A.   I hate to use the word anger.  Maybe annoyance that
     continued.

Q.   Okay.  Anything else?

A.   No.

Q.   Okay.  Are there any other damages that you're seeking in
     this case that aren't listed in your response to

                                12

interrogatory number 8?

A.    I think - - let me say that number 8 details the damages we
      are seeking.

Spector Depo. 44:9-46:3.   Spector also seeks statutory and

punitive damages, charging that Equifax's non-disclosures were

willful.


## II.  Recommended Ruling

Magistrate Judge Margolis recommended denial of plaintiff's

motion for partial summary judgment [Doc. #58], denial as moot of

defendant's motion for summary judgment [Doc. #65], grant of

defendant's amended and supplemental motion for summary judgment

[Doc. #72], denial of plaintiff's motion to strike [Doc. #76],

and denial of plaintiff's motion for permission to supplement his

reply in support of summary judgment [Doc. #89].   More precisely

as relevant to Spector's objections, the magistrate judge

concluded: 1) that a jury could conclude that Equifax was

negligent in failing to provide Spector his credit file in

response to his requests of December 12, 2002 and May 7, 2003 but

that Spector's postage expenditures, which the record reveals

amount to $4.42, were insufficient in and of themselves to

constitute actual damages for FCRA purposes or ascertainable loss

for CUTPA purposes and that, under Casella v. Equifax Credit

Information Services, 56 F.3d 469 (2d Cir. 1995), any emotional

distress suffered by Spector in connection with Equifax's

13

failures to disclose were not actionable as actual damages;
2) the failure of evidence on actual damages precluded Spector's
recovery under 15 U.S.C. §§ 1681g, 1681o for negligent failure to
clearly and accurately disclose to Spector upon request his
credit file; and 3) there is no evidence in the record from which
a jury could conclude that Equifax's failure to disclose
Spector's credit file to him was willful, stating that if
Equifax's off-line policies had been correctly implemented no
failure to disclose would have occurred, and therefore Spector's
claim of willful non-disclosure pursuant to 15 U.S.C. § 1681g,
1681n failed as a matter of law.

### III. Standard

Summary judgment "shall be rendered forthwith if the
pleadings, depositions, answers to interrogatories, and
admissions on file, together with the affidavits, if any, show
that there is no genuine issue as to any material fact and that
the moving party is entitled to a judgment as a matter of law."
Fed. R. Civ. P. 56(c).  Where, as here, a party moves for summary
judgment on claims on which the non-moving party bears the burden
of proof at trial, the moving party still shoulders the initial
responsibility to identify those portions of the court or
discovery record together with affidavits, if any, believed to
demonstrate the absence of a genuine issue of material fact on an

14

essential element of the non-moving party's claim.  <u>See</u> <u>Celotex</u>
<u>Corp. v. Catrett</u>, 477 U.S. 317, 322-24 (1986).  The non-moving
party must then go beyond the pleadings and by her own
affidavits, or by evidentiary support found in the court or
discovery record, designate specific facts establishing a genuine
issue of material fact on any element essential to the non-moving
party's case that was sufficiently called into question by the
moving party.  <u>See</u> <u>id.</u>  The "District Court must resolve any
factual issues of controversy in favor of the non-moving party,"
<u>Lujan v. Nat'l Wildlife Fed'n</u>, 497 U.S. 871, 888 (1990), mindful
that "at the summary judgment stage the judge's function is not
himself to weigh the evidence and determine the truth of the
matter but to determine whether there is a genuine issue for
trial."  <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 249
(1986).  The District Court's ultimate concern is "whether there
is a need for a trial -- whether, in other words, there are any
genuine factual issues that properly can be resolved only by a
finder of fact because they may reasonably be resolved in favor
of either party."  <u>Id.</u> at 250.


**IV.  Spector's Objections and Discussion**

Spector essentially makes two objections to the Recommended
Ruling [Doc. #92].  First, he argues that application of the
<u>Casella</u> actual damages standard was improper because that

15

standard does not apply to the mandatory disclosure provisions of 15 U.S.C. § 1681g at issue here and that, even if it does, rejection of Spector's postage damages as insufficient was incorrect.  Second, Spector argues that the magistrate judge applied the wrong standard in deciding the issue of punitive damages, using "willful, deliberate, and intentional" instead of "reckless indifference," and that there is enough evidence for a jury question on willfulness.  The Court addresses each of these objections in turn.

**A.   Casella Standard and Postage Damages**

15 U.S.C. § 1681g(a) provides, "[e]very consumer reporting agency shall, upon request, ... clearly and accurately disclose to the consumer [a copy of his or her credit file]," and 15 U.S.C. § 1681o allows the consumer to recover actual damages for a consumer reporting the agency's negligent non-compliance with its disclosure obligations.  Contrary to Spector's statement of the case, the Recommended Ruling [Doc. #92] did not rule that Equifax was negligent as a matter of law but that a jury could find negligence.  Neither party seeks review of that conclusion and the Court therefore does not address it.

With respect to Spector's alleged postage damages (or "use of equipment to produce the request, and the time for creating and mailing the request," Pl.'s Obj. [Doc. #96] at 6), Spector is

16

precluded from recovering such monies under the disclosure provision of § 1681g(a) because they were expended prior to Spector making a request for his credit file and thus cannot be causally linked to a subsequent failure to disclose.  Any postage costs for mailing the December 12, 2002 and May 7,2003 requests occurred before Equifax received those requests on December 20, 2002 and May 10, 2003 respectively and thus were necessarily incurred before any failure to respond to them.  Moreover, while Spector's counsel creatively argues that Spector mailed the May request by certified mail because Equifax claimed the December request had never arrived, <u>see</u> Opp'n [Doc. #79] at 3, there is no evidentiary basis for counsel's argument; rather Spector's affidavit provides merely a declarative statement with no mention of purpose: "I sent the May 7, 2003, request by certified mail, return receipt requested."  Pl.'s Aff. [Doc. #61] ¶ 17.  In sum, there is no evidence of a causal link between any Equifax violation of the disclosure provisions of 15 U.S.C. § 1681g(a) and Spector's claimed out-of-pocket expenses.  <u>See also</u> <u>Casella</u>, 56 F.3d at 474 (expenses incurred prior to litigation of FCRA claims to notify consumer reporting agencies of disputed accuracy in credit report and to request inclusion of dispute statement not compensable as actual damages since 15 U.S.C.  § 1681i(a) generally imposes no duty to reinvestigate credit information <u>prior</u> to being notified and 15 U.S.C. § 1681i(c) does not require

17

inclusion of statement of dispute <u>until</u> consumer provides one;
thus plaintiff's expenses were not incurred to force compliance
with the FCRA but to initiate corrections and neither defendant
consumer agency could have violated FCRA before having received
plaintiff's notice and request).

The Court agrees with Spector that <u>Casella</u> dealt primarily
with the inaccurate information FCRA provisions and not with the
mandatory disclosure provisions at issue here, but disagrees that
<u>Casella</u>'s damages discussion is therefore inapplicable to
Spector's claim of emotional distress.  "The purpose of
[15 U.S.C. § 1681g(a)]'s disclosure requirement is to provide the
consumer with an opportunity to dispute the accuracy of
information in his file." <u>Hauser v. Equifax, Inc.</u>, 602 F.2d 811,
817 (8th Cir. 1979).  Plaintiff acknowledges this, stating "[t]he
sections mandating disclosure to the consumer on request give the
consumer the right to review his private financial information
before it is sold for profit by the credit bureaus" so that
provision of credit information to potential creditors does not
occur after a consumer is "denied the fundamental ability to
review and challenge the dissemination of inaccurate
information...." Pl.'s Obj. [Doc. #96] at 4.  Recognizing that
actual damages in FCRA cases may include humiliation and mental
distress even in the absence of out-of-pocket expenses, <u>Casella</u>
held that corroborated affidavit testimony alleging severe

18

emotional distress from knowing one's credit report contains
inaccurate and damaging credit information failed to raise a
genuine issue of material fact because, absent evidence of
dissemination of the inaccurate information to potential
creditors or others, there was no causal link between the alleged
emotional distress and the alleged FCRA violations, i.e.,
preparing of an inaccurate credit report and refusal to delete
the false information or include a statement of dispute after
being notified by plaintiff of the inaccuracy.  <u>Casella</u>, 56 F.3d
at 474-75.  The harm feared by the provisions at issue in <u>Casella</u>
is identical to that addressed by the disclosure provision at
issue here, namely, that a potential creditor or other person
will receive damaging and inaccurate credit information from a
consumer reporting agency without the consumer being permitted to
intervene on his or her own behalf.  The difference here--that
Spector suspects inaccurate information exists in his credit
report but does not know for sure because he cannot get a copy
while Casella knows his credit report contains inaccurate
information--does not suggest <u>Casella</u>'s inapplicability, rather
the opposite conclusion.  If emotional distress resulting from
knowledge of a potentially damaging item in a credit report is
not causally linked to an inaccurate information provision before
dissemination, emotional distress resulting from surmising but
not knowing that a potentially damaging item may exist is not

19

causally linked to a disclosure provision designed to prevent the same harm of dissemination of inaccurate information.  Only upon release of the inaccurate information is the harm feared by both types of provisions potentially realized and thus actionable.

There is thus no evidence in this case linking any Equifax failure to disclose with Spector's claimed emotional distress under the three possible scenarios.  The first possibility, failure to disclose after receipt of Spector's December 12, 2002 letter, occurred <u>after</u> Citizens' Bank received a 'no file' response from Equifax.  The second possibility, failure to disclose after receipt of Spector's May 7, 2003 letter, also occurred <u>after</u> Gulf Oil's April 7 and 18 receipt of a 'no-file' response from Equifax.  The third possibility is dissemination of inaccurate credit information to Gulf Oil caused by failure to disclose in response to Spector's December 12, 2002 letter.  In theory, it is a viable claim; had disclosure been made in response to Spector's December 12, 2002 record, Spector could have corrected any inaccurate information subsequently conveyed to Gulf Oil and thereby prevented Gulf Oil's April 8 refusal to reactivate his account.  However, it fails for two reasons.  First, assuming Equifax had sent a copy of Spector's report and not a 'no file' response to Gulf Oil, it is undisputed that Spector received a copy of his credit file on March 11, 2003, suggested revisions through his counsel shortly thereafter,

20

received an updated copy of his credit file on March 18, 2003,

and made no further communications to Equifax about inaccuracies

in the updated file until receiving another copy in July 2003.

Thus, Spector had a full opportunity, even if not because of his

December 12, 2002 request, to correct any information in his

credit report before Gulf Oil received Equifax's April 7 'no

file' response.  Any causal connection to Equifax's failure to

disclose was severed.

Second, because of Equifax's off-line policies, Gulf Oil

would have received Equifax's April 7 no file response regardless

of whether or not Spector had received his credit report at any

time between December 12, 2002 and April 7, 2003.  Since Gulf Oil

did not further contact Equifax for Spector's credit file, but

issued its April 8 adverse action letter, there is no evidence to

support the conclusion that any emotional distress resulting from

the adverse action letter is attributable to Equifax's failure to

disclose in response to Spector's December 12 request.  Rather,

such distress is attributable to Equifax's off-line policies and

not actionable under the credit file <u>disclosure</u> provision of

15 U.S.C. § 1681g(a).  In other words, on the record facts here,

Equifax's off-line policies break any causal connection between

failure to disclose a credit file and emotional distress

resulting from an adverse action letter triggered solely by a 'no

file' response.  Accordingly, there is no evidence of actual

21

damages that can support Spector's negligent non-compliance claim
for failure to disclose his credit report.


**B.    Willfulness**

Spector admits that the proper standard for willful non-
compliance under 15 U.S.C. § 1681n(a) is whether Equifax
consciously disregarded or deliberately and purposefully violated
Spector's rights under the FCRA.    See <u>Casella</u>, 56 F.3d at 476.
The Recommended Ruling states:

> In his reply brief, plaintiff contends that defendant's
> failure to comply with plaintiff's requests was deliberate
> because 'the offline policy that resulted in the repeated
> violations was adopted intentionally[;] ... [defendant] was
> repeatedly put on notice of the disclosure request...,' and
> defendant was 'willing to disregard the express limitations
> of ... FCRA.'    (Dkt. #82, at 2).    Willful noncompliance
> exists when a defendant acted in "'conscious disregard' of
> the consumer's rights or that the defendant's noncompliance
> with ... FCRA was 'deliberate and purposeful.'" <u>Spector v.
> Trans Union LLC First USA Bank</u>, 301 F.Supp.2d 231, 237 (D.
> Conn. 2004)..., <u>citing</u> <u>Casella</u>, 56 F.3d at 476.... There is
> no evidence in the record that defendant acted in a willful,
> deliberate, and intentional manner in its failure to provide
> plaintiff with a copy of his credit report.

Recommended Ruling [Doc. #92] at 19.    As to plaintiff's
contention that the wrong legal standard was applied, the Court
perceives little, if any, difference between "conscious
disregard" and "deliberate and purposeful" and "willful,
deliberate, and intentional," particularly where, as here, the
magistrate judge clearly defined the latter with the content of
the former two.

Under this standard, to survive Equifax's motion to dismiss, there must be evidence sufficient to support a jury finding that Equifax was aware of Spector's request or requests for a copy of his credit report, knew of its own obligation to provide a copy of the report upon request, and consciously and purposely decided not to disclose the report. Equifax does not dispute knowing of its FCRA obligation to respond to consumer requests for credit files. Indeed, its off-line backup policies are specifically designed at least on their face to comply with the disclosure requirement. Spector urges that the magistrate judge disregarded the inferences of willful noncompliance that a jury could draw from the record evidence. <u>See</u> Mem. [Doc. #96] at 10. The Court agrees and concludes that, while a close question, there is enough evidence in the record to get to a jury on the issue of willful failure to disclose to Spector a copy of his credit report in response to both the December 12 and May 7 requests.

Equifax received Spector's December 12, 2002 request for his credit report on December 20, 2002. Because <u>Spector I</u> was pending, Equifax had taken Spector's file off-line and it was not available. Equifax's taking of Spector's file off-line due to his filing of <u>Spector I</u> arguably constitutes an overbroad application of its own policy as it is not at all apparent why a lawsuit based on improper disclosure to users to conduct account reviews would trigger a concern that the report might contain

23

disputed or inaccurate information or that Spector's identity was being stolen, the purported purposes for the existence of the policy. As demonstrated by Equifax's prompt response to Spector's wife's request of the exact same time period, a jury could conclude that Equifax's off-line policy caused an alteration in Equifax's normal short response time to consumers' requests for their credit files. In accord with Equifax's backup policy, Spector's December 12 request was forwarded by Equifax's Operator Z45 to Equifax's Office of Consumer Affairs but never made its way to Love, who was tasked with handling the request under the backup policy. Admittedly, Love's and Faulkner's e-mail correspondence between January 9 and February 13 reveals only that Love was aware that Spector claimed he had made the December 12 request, not that he actually had. It is undisputed that Love inquired as to details on the timing of the request, a fact suggesting his intention to do what he next did, investigate with the Office of Consumer Affairs as to any record of the request. However, on February 13, 2003, Faulkner e-mailed Love explicitly asking that Spector's credit report be sent to him. In light of Love's January 13 statement that all Faulkner had to do was make such a request and a copy would be sent, and Love's position under Equifax policy as being in charge of all such requests, a jury could infer: that Equifax authorized this form of request for a credit file; that Faulkner's February 13, 2003

24

e-mail coupled with Spector's attached complaint was a continuation of Spector's December 12 request at Love's invitation; and that Love had the responsibility for handling the request.  A jury could also find that the fact that Spector was sent his credit report one month later in connection with the settlement of Spector I was spuriously correlated with Faulkner's February 13 request and that the month lag in response time coupled with the issuance of a credit report only as a condition of settlement constitutes a willful disregard of Spector's right to get a copy of his credit report "upon request"[3] without strings attached.  Under that reasoning, if credited, a jury could find a willful non-disclosure violation in connection with Spector's December 12 request.

Spector's May 7 request presents a stronger case.  A jury could find that the request was received by Equifax on May 10, that it was forwarded to the Office of Consumer Affairs and then to Love for handling, that Love e-mailed the appropriate person at Equifax on June 3, 2003 instructing that a copy of Spector's credit report be sent to him, that Equifax ignored Love's instruction, that, on July 10, 2003 Equifax's representative Al Cole was presented with Spector's May request and return receipt

---

[3] Equifax's repeated argument that there is no timing requirement for response found in 15 U.S.C. § 1681g(a) is incorrect.  The statutory language "upon request" naturally connotes an immediacy, one that Equifax's normal policies apparently comply with by responding to request on the same day as received or within a few days thereafter.

25

and that then, on July 16, 2003, Equifax sent Spector a copy of his credit report.  A jury could thus conclude that Equifax consciously disregarded Spector's request for over a month and only filled it after being shown it at a court-initiated settlement conference, thus willfully disregarding plaintiff's right to disclosure of his credit report without strings attached.  A jury, of course, could also conclude that somehow the request simply got lost and, when an Equifax representative learned of it, he promptly and conscientiously acted to get a report to Spector.  Two permissible jury conclusions on the record evidence require a trial for resolution.

The appellate case law on willful non-compliance in the context of the disclosure requirements of 15 U.S.C. § 1681g(a) is sparse.  The Court is aware of only two such cases, <u>Millstone v. O'Hanlon Reports, Inc.</u>, 528 F.2d 829 (8th Cir. 1976) and <u>Hauser v. Equifax, Inc.</u>, 602 F.2d 811 (8th Cir. 1979).  Admittedly, the facts of <u>Millstone</u> have little applicability here, upholding a jury verdict of willful non-compliance where defendant outright refused on three occasions to furnish plaintiff with a copy of his credit report, misled him as to and concealed the true nature of the credit report with partial oral disclosures, and only provided a full report after being sued.  See <u>Millstone</u>, 528 F.2d at 833-34.  It is significant that one factor singled out as supporting a willfulness conclusion was the need for legal

26

process to force compliance with the disclosure provisions.  As
set forth above, a jury could find that Equifax disregarded
Spector's requests until conditioned on a settlement or as a
result of being confronted with non-disclosure evidence at a
settlement conference.

Hauser falls on the other end of the spectrum from
Millstone.  There, the Eighth Circuit affirmed a directed verdict
for Equifax, concluding there was insufficient evidence to
support a finding of willful noncompliance with the FCRA's
disclosure requirement of 15 U.S.C. § 1681g(a) where the only
evidence in the record explaining why one report had not been
disclosed to the plaintiff, whereas the contents of another had
been disclosed, was testimony of Equifax's claims manager that
the two reports were stored in separate files.  Hauser, 602 F.3d
at 817.  Thus "[t]here [was] no evidence from which it could be
reasonably inferred that, at the time of [plaintiff's] request
for disclosure, [Equifax's claim manager] knew the [undisclosed
report] had been made."  Id.  Here, by contrast, it is undisputed
that Love knew of the existence of Spector's credit report, knew
of Spector's December 12 request as metamorphosed into Faulkner's
February 13 e-mail (in the transformed form explicitly requested
by Love), and knew, as counsel of record in Spector I, that the
request was heeded only one month later as a condition of
settlement.  Similarly, a jury could find that Love, the

27

responsible person at Equifax for handling Spector's May 7 request, knew of the existence of Spector's credit report and instructed Equifax by e-mail to send it to Spector and no report was sent until six weeks later after a prompting settlement conference under court auspices.

The Court thus concludes that this case falls somewhere between <u>Millstone</u>, an easy decision for plaintiff, and <u>Hauser</u>, an easy decision for defendant, in the area where willful non-compliance remains a jury question.  There are hints in the Second Circuit's decision in <u>Casella</u> that this is the correct result.  <u>Casella</u> affirmed the district court's grant of summary judgment on an alleged willful violation of failing to delete a disputed entry in a credit report or failing to include a statement of dispute in it where the consumer reporting agencies had received deletion instructions from the relevant creditor because, both before and after the receipt of the first such instruction, that creditor had again reported the consumer owed child support: "[t]hroughout the relevant period, [the creditor] was sending mixed signals to Casella, Equifax, and Trans Union. Appellees' course of conduct does not support the kind of 'conscious disregard' or 'deliberate and purposeful' actions necessary to make out a claim for willful noncompliance under the FCRA."  <u>Casella</u>, 56 F.3d at 476.  The Court understands this discussion to suggest that, had the consumer reporting agencies

28

not received mixed signals and refused to delete the very item

they were told to delete by the reporting creditor, a jury

question on willful non-compliance would have existed.  Here,

there were no mixed signals.  Counsels' respective e-mails and

Love's own June 3 e-mail unmistakably demonstrated knowledge of

the disclosure requirement and knowledge of Spector's request yet

those requests awaited legal proceedings before they were

fulfilled.


**V.    Conclusion**

As set forth above, Magistrate Margolis' Recommended Ruling

[Doc. #92] is MODIFIED with the following results: plaintiff's

motion for partial summary judgment [Doc. #58] is DENIED,

defendant's motion for summary judgment [Doc. #65] is DENIED as

MOOT, defendant's amended and supplemental motion for summary

judgment [Doc. #72] is GRANTED in PART and DENIED in PART,

plaintiff's motion to strike [Doc. #76] is DENIED, and

plaintiff's motion for permission to supplement his reply in

support of summary judgment [Doc. #89] is DENIED.

Shortly after filing the motion for partial summary

judgment, Spector filed two discovery-related motions, a motion

for discovery orders [Doc. #62] and a motion for leave to file

supplemental objection [Doc. #64].  Magistrate Judge Margolis

DENIED the former without prejudice to renew simultaneously with

her issuance of the Recommended Ruling.  <u>See</u> Order [Doc. #91].
As there is overlap between the two motions and the discovery
requested therein does not on its face affect the Court's holding
on actual damages (and thereby the ultimate result reached here),
the motion for leave to file [Doc. #64] is also DENIED without
prejudice.  Spector will have twenty calendar days from his
counsel's receipt of this ruling to re-file an omnibus motion
setting forth what discovery is still needed and specifics on how
it will affect the only remaining issue in this case, whether
Equifax twice willfully violated the disclosure provision of 15
U.S.C. § 1681g(a).


                              IT IS SO ORDERED.



                              _____
                              Janet Bond Arterton, U.S.D.J.


Dated at New Haven, Connecticut: <u>September 29  , 2004</u>


                              30